[Cite as *In re A.C.*, 2016-Ohio-835.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE:  A.C.                                    :
                                               :
                                               :       C.A. CASE NO.   26919
                                               :
                                               :       T.C. NO. 2013-1236
                                               :
                                               :       (Civil appeal from Common
                                               :        Pleas Court, Juvenile Division)
                                               :
                                               :
                        . . . . . . . . . . .

**O P I N I O N**

Rendered on the ___4th___ day of _____March_____, 2016.

. . . . . . . . . . .

CARLEY J. INGRAM, Atty, Reg. No. 0020084, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

JONATHAN A. HORWITZ, Atty. Reg. No. 0068181, 20 S. Main Street, Springboro, Ohio 45066
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} Petitioner-appellant S.C. (hereinafter "Father") appeals a decision of the Montgomery County Court of Common Pleas, Juvenile Division, overruling his objections and adopting the decision of the magistrate awarding permanent custody of his biological son, A.C., to Montgomery County Children's Services (MCCS).  Father filed his timely

notice of appeal with this Court on November 13, 2015.

{¶ 2} Initially, we note that the original permanent custody case from which the instant appeal arises involved the care and placement of A.C. (born in 2003) and his older half-brother, J.B. (born in 2001). A.C. is the son of Father and Jessica B. (hereinafter "Mother"). J.B. was born to Mother from a previous relationship with W.R. Mother and Father raised both A.C. and J.B. together in the same household. W.R. had no relationship with J.B. In fact, J.B. was unaware that Father was not his biological parent until after the neglect and dependency proceedings began.

{¶ 3} On February 22, 2013, MCCS filed a neglect and dependency complaint seeking interim temporary custody of A.C. and J.B. after Father was arrested in West Carrollton, Ohio for operating a vehicle while under the influence (OVI). At the time Father was arrested, Mother was hospitalized at Kettering Behavioral Health and was unable to provide care for her children. The complaint also stated that Mother and Father had failed to enroll either A.C. or J.B. in school. Accordingly, on February 26, 2013, the magistrate granted MCCS interim temporary custody of A.C. and J.B., and the boys were placed in a foster home where they remained throughout the proceedings.

{¶ 4} On March 11, 2013, the magistrate appointed a guardian ad litem (GAL) to represent A.C. and J.B. The GAL subsequently filed her initial report wherein she recommended that temporary custody of the boys be awarded to MCCS. The GAL's report also noted that both Mother and Father had mental issues that needed to be addressed, and individual case plan objectives were created for them to follow. On May 29, 2013, A.C. and J.B. were adjudicated dependent and temporary custody was awarded to MCCS. Thereafter, on May 19, 2014, the magistrate granted the first extension of

temporary custody of A.C. and J.B. to MCCS.

{¶ 5} On August 11, 2014, MCCS filed a motion requesting that permanent custody of A.C. be awarded to MCCS. MCCS filed a similar motion with respect to J.B. on the same day. Specifically, MCCS argued that A.C. was afraid of Father and did not want to attend supervised visitation with him or Mother any further. MCCS also asserted that neither Mother nor Father had completed their parenting and psychological assessments, and neither parent had made substantial progress on their individual case plan objectives.

{¶ 6} Shortly thereafter, a permanent custody hearing was held on October 28, 2014. All parties were present at the hearing and represented by counsel. On January 22, 2015, the magistrate issued her decision in which she awarded permanent custody of A.C. and J.B. to MCCS, thereby terminating Mother and Father's parental rights. Father filed his initial objections to the magistrate's decision on February 5, 2015. On September 8, 2015, Father filed supplemental objections to the magistrate's decision. In a decision issued on October 14, 2015, the juvenile court overruled Father's objections and adopted the magistrate's decision granting permanent custody of A.C. and J.B. to MCCS.

{¶ 7} It is from this decision that Father now appeals.[1]

{¶ 8} Father's sole assignment of error is as follows:

{¶ 9} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT MCCS PROVED BY CLEAR AND CONVINCING EVIDENCE THE ESSENTIAL STATUTORY ELEMENTS FOR GRANTING THE MOTION FOR PERMANENT

---

[1] We note that neither Mother nor W.R., father of J.B., filed objections to the magistrate's decision nor appealed the decision of the juvenile court regarding the permanent custody of A.C. or J.B.

CUSTODY."

{¶ 10} In his sole assignment, Father contends that the trial court erred when it awarded permanent custody of A.C. to MCCS, thereby terminating his parental rights to the minor child. In support of his argument, Father argues that MCCS failed to adduce clear and convincing evidence of the following: 1) that MCCS made reasonable efforts to reunite A.C. with Father; 2) that Father was unwilling to provide for A.C.'s educational needs; and 3) that A.C. cannot be reunited with Father within a reasonable period of time.

{¶ 11} As this Court has noted:

A children services agency that has been awarded temporary custody of a child may move for permanent custody. R.C. 2151.413(A). Before the court may award the agency permanent custody of a child, the court must conduct a hearing. R.C. 2151.414(A)(1).

A trial court may not grant a permanent custody motion unless the court determines that (1) it is in the best interest of the child to grant the agency permanent custody, and (2) *one* of the conditions set forth in R.C. 2151.414(B)(1)(a) -(d) exists.

*In re J.E.,* 2d Dist. Clark No. 07–CA–68, 2008–Ohio–1308, ¶ 8–9 (emphasis added).

{¶ 12} R.C. 2151.413 dictates when a children services agency may seek permanent custody of a child. With some exceptions, R.C. 2151.413(D) generally requires a children services agency to pursue permanent custody of a child that has been in the agency's temporary custody for twelve or more months of a consecutive twenty-two month period. Here, the record establishes that A.C. had been in temporary custody for approximately seventeen months, clearly in excess of twelve months of a consecutive

twenty-two month period, at the time that MCCS filed its motion for permanent custody on August 11, 2015.

{¶ 13} R.C. 2151.414(B) sets forth the circumstances under which a court may grant permanent custody of a child to a children services agency. If the child has been in the custody of the children services agency for twelve or more months of a consecutive twenty-two month period at the time the motion for permanent custody is filed, the court need only determine whether permanent custody is in the child's best interest. R.C. 2151.414(B)(1)(d). The court need not consider whether the child can be placed with either parent within a reasonable time or should not be placed with the child's parents, as would be required under R.C. 2151.414(B)(1)(a). *In re C. W.,* 104 Ohio St.3d 163, 166–167, 2004–Ohio–6411, at ¶ 21. All of the court's findings must be supported by clear and convincing evidence. R.C. 2151.414(E); *In re J.R.,* 2d Dist. Montgomery No. 21749, 2007–Ohio–186, ¶ 9.

{¶ 14} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (a) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (b) the wishes of the child; (c) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable. *Id.*

{¶ 15} After a thorough review of the record, we find that the juvenile court properly considered all of the factors in R.C. 2151.414(D) when it determined that it was in the best interests of A.C. to be placed in the permanent custody of MCCS. The record established that after being removed from Father's custody, A.C. was placed in a two-parent foster home where he remained throughout the pendency of this case. A.C.'s therapist, Jennifer Fugett, testified that he stated that he was content with his foster placement and that his foster parents were very supportive and caring. MCCS supervisor, Kamesha Johnson, testified that A.C.'s relationship with his foster parents appeared to be positive and appropriate. Johnson testified that A.C. was able to communicate his feelings to his foster family, and they all do homework together.

{¶ 16} S.L., A.C.'s foster mother, testified that when he was first placed in her care, he did not know how to wash himself because he had always been made to shower with Mother. S.L. testified that A.C.'s hair was dirty and reached down to his waist. A.C. informed S.L. that he had always wanted to get his hair cut so that he "would look like a boy."

{¶ 17} MCCS also discovered that A.C. had never received any formal school training. Father informed MCCS that A.C. did not attend formal school because he was being home-schooled. Johnson testified that Father informed her that he had developed a home-school system to meet A.C.'s educational needs. Upon custody being granted to MCCS, A.C. was immediately placed in formalized school based upon his age group. Johnson testified that A.C. initially struggled in school and was academically behind during his first year. S.L. testified that A.C. was barely able to read when he first came into her care. However, after attending summer school, A.C. was able to catch up

academically with other students in his class. S.L. testified that A.C. was doing very well in school and does not like to miss class. S.L. further testified that A.C. did not want to go back to home-schooling and that one of his major frustrations upon being first placed with MCCS was that he had never been allowed to attend formal school. Johnson testified that Father told the boys that when they were returned to his custody, the home-schooling regimen would resume, and they would no longer be able to attend formal school.

{¶ 18} The record also establishes that A.C. has made a great deal of progress socially since being placed with his foster family. Johnson testified that A.C. stated that he and his brother, J.B., never left their home during the day before being placed in foster care. A.C. stated that he and J.B. only ever left their residence at night. A.C. and J.B. never went to a playground when other children were present. Fugett testified that A.C. told her that on the rare occasion when he and J.B. were allowed to play outside, Father and/or Mother would make them come in if other children appeared. S.L. testified that A.C. was extremely shy when he first came to live with his foster family and that he was very intimidated talking to other children. Johnson described A.C. as being socially awkward and as having difficulty making friends. S.L. testified that after the passage of time, A.C. began talking to other children and making friends rather easily. S.L. testified that she and her husband also taught A.C. how to ride a bike. Johnson testified that A.C. seemed happy and well-adjusted with his foster family.

{¶ 19} Conversely, Johnson testified that A.C. stated that he is scared of Father and did not want to return to his parents' home. Fugett testified that A.C. told her that he witnessed past instances of domestic violence between Father and Mother. A.C. also

reported instances of "steam-rolling," where Father would roll over on top of him as punishment for acting up. A.C. further reported that he often felt afraid that Father was going to hurt someone. Fugett testified that A.C. stated that he was afraid that if he returned to Father's custody, the domestic violence would continue. The GAL noted that although A.C. stated that he told Father and Mother that he wanted to come home, he did so only because he was afraid that Father would get upset and hurt him if he stated otherwise.

{¶ 20} Additionally, we note that the juvenile court found that Father did not substantially comply with his case plan objectives which included the following: 1) complete a drug, alcohol, and metal health assessment and follow all recommendations; 2) maintain stable housing; 3) maintain stable income; 4) complete a parenting/psychological evaluation and follow all recommendations; 5) regularly visit the child; and (6) sign releases of information as necessary.

{¶ 21} Initially, we note that A.C. reported that Father drank "a lot" in the home. Johnson testified that A.C. reported that Father would drink wine and other types of alcohol on a regular basis. Johnson testified that when she asked Father about his OVI which led to his children being removed, he stated that all of the information was falsified and that he had never abused any substances. Father stated that he was charged with the OVI only because someone falsified his urine test by contaminating it with other chemicals. Father suggested another positive alcohol test conducted at Johnson's office was attributable to baklava that he had eaten earlier.

{¶ 22} Father also failed to undergo a parenting/psychological assessment even though his mental health was clearly a concern for MCCS. Specifically, Father told

Johnson several grandiose and inconsistent stories that could not be verified. At one point, Father informed Johnson that he was the third richest man in the country but had donated all of his money to Cancer Treatment Centers of America, which he had also founded. Father stated that he was the lead guitarist for both Mick Jagger and Ozzie Osbourne. Father also reported that he used to be attached to Special Operations in some unspecified branch of the military. Father further stated that he had studied to be a priest, physician, and an attorney.

{¶ 23} Father reported that he had previously been diagnosed with Tourette's syndrome and was subject to frequent crying episodes. Father also stated that he suffered from multiple concussions that he received when he was beaten "ten years ago twice by black men who broke into his place." The concussions caused him to have "difficult issues." Johnson testified that Father informed her that he was allergic to all types of psychotropic medications. We note that Father did attend and complete a drug, alcohol, and metal health assessment, but the record establishes that he failed to follow any of the recommendations made by the staff at the Consumer Advocacy Model (CAM) program. Johnson testified that CAM recommended that Father see a psychiatrist. Johnson testified that Father stated that he "didn't need that type of help." Father further stated that everything was a simply the result of a misunderstanding. Father informed Johnson that he was "upper cognitive" and that he did not need substance abuse or mental health treatment because he had never suffered from those types of issues in the past.

{¶ 24} We also note that Father initially had unsupervised visits with A.C. and J.B. after they were removed from his custody. However, after Father took the boys into a

closed room and forced them to eat oranges until they were crying and very upset, the visits became supervised. Even after the visits became supervised, Father still acted in an erratic and inappropriate manner. Notably, after he had been warned by MCCS staff to refrain from discussing the custody case with A.C. and J.B., Father resorted to whispering to the boys and writing out messages on his phone for them to read. Father made fun of the caseworker and called her names in front of A.C. When the two boys visited at the same time, Father treated A.C. better than J.B. After the two boys were separated for visits, Father said bad things about J.B. to A.C. In fact, Father's conduct during the visits left A.C. so scared and anxious that he refused to attend until the magistrate ordered the visitation to resume under stricter supervision.

{¶ 25} Accordingly, we find competent, credible evidence from which the trial court properly concluded that the statutory elements for termination of Father's parental rights were established. The record does establish that Father completed several of his case plan objectives pertaining to housing, income, and regular visitation with A.C. Significantly, however, the record also establishes that Father refused to seek mental health and substance abuse treatment after being referred to a psychiatrist for his clearly delusional and erratic behavior. A.C. exhibited an ongoing fear of Father and believed that he was going to eventually hurt someone. Father kept A.C. isolated from the world and had barely provided him the skills to even wash himself. As a result of his isolation, A.C. was very shy and lacked social skills. Father also refused to allow A.C. to attend formal school, choosing instead to inadequately home-school the child. Notably, A.C. could barely read at all after initially being removed from Father's custody. Father reported that if he were to regain custody, he would remove A.C. from regular

school and the home-schooling would begin again.

{¶ 26} Conversely, the record establishes that since being removed from Father's custody, A.C. has thrived with his foster family who are very supportive and caring. A.C attends formal school where he is advancing normally for a child his age. A.C. has made friends and does not have to live in constant fear of his Father's delusional and violent behavior. Competent credible evidence also supports the determination that A.C. could not be placed with Father within a reasonable period of time as set forth in R.C. 2151.414(B). Therefore, we conclude that the juvenile court did not err when it awarded permanent custody of A.C. to MCCS.

{¶ 27} Father's sole assignment of error is overruled.

{¶ 28} Father's sole assignment of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . .

FAIN, J. and WELBAUM, J., concur.

Copies mailed to:

Carley J. Ingram
Jonathan A. Horwitz
Hon. Nick Kuntz